## Harry Williams v. The State.

### No. 3440.   Decided April 17, 1907.

**1.—Murder in First Degree—Continuance—Self-Defense.**

Upon trial for murder, where the second motion for continuance showed the testimony of the absent witness to be threats of the deceased against defendant, and the record showed that the defendant's own confession eliminated all questions of self-defense, there was no error in overruling the application; especially where it was shown that such absent witness was present at a former term of the court, when defendant was granted a continuance to procure testimony to support the theory of insanity, and defendant did not claim then that said absent witness would testify to anything favorable to defendant at that time.

**2.—Same—Argument of Counsel—Testimony.**

Where upon trial for murder the argument of the State's counsel, as to who defendant was, was based upon the testimony of defendant giving a history of his life, the argument was legitimate and there was no error.

**3.—Same—Withdrawal of Testimony—No Charge Requested.**

Where upon trial for murder the State's counsel used argument based upon testimony which had been withdrawn, and defendant did not request a charge eliminating this matter from the jury, there was no reversible error.

**4.—Same—Argument of Counsel—Dispute Between Counsel.**

Where upon trial for murder, the State's counsel alluded to an expression that one of defendant's counsel should have made, and it developed that the counsel to whom the district attorney imputed the allusion did not make it, but that his colleague, another attorney for the defendant had made it, there was no reversible error.

**5.—Same—Continuance—Witness—Self-Defense.**

Where upon trial for murder the defendant claimed in his motion for continuance that the absent witness was spirited away so that he could not use his testimony, and the court offered to hear testimony on this question before passing on the application for continuance, but defendant's counsel declined to investigate the matter, there was no error in refusing the continuance; especially where the testimony of the absent witness related to matters of self-defense, which was not an issue in the case.

**6.—Same—Sufficiency of Evidence—Death Penalty.**

Where the evidence in a trial for murder showed a cold-blooded and deliberate killing, and perhaps with sufficient certainty that the same occurred for the purpose of getting the money or property of the deceased, the death penalty was warranted.

Appeal from the District Court of Jefferson. Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*J. V. Fleming* and *A. L. Calhoun,* for appellant.—On question of continuance: McAdams v. The State, 5 S. W. Rep., 826; Phipps v. State, 34 Texas Crim. Rep., 560; Land v. State, 34 Texas Crim. Rep., 330.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Having been convicted of murder in the first degree and given the death penalty, appellant brings his case to this court on appeal, assigning several errors.

A brief summary of some of the facts are stated as follows: The deceased Carr was a guard at the county convict camp. Appellant was a convict and at the time of the homicide was treated as a trusty; he and deceased slept together, the State's theory being that they were unusually friendly, and constantly together when their duties would permit. Appellant's theory was that deceased threatened his life, and had pointed his pistol at him (appellant) several times, accompanied by threats to take his life. Appellant alone testifies to his theory. The deceased was night guard, sleeping during the day. On the morning of the killing he (deceased) had taken his breakfast and retired to his room, laid down for the purpose of sleeping, and while in this condition appellant went to the room and killed him by shooting him in the head with a shot-gun. Appellant's confessions, elaborately made, were introduced through the mouths of several witnesses. The substance of the confessions is that deceased came in the breakfast room, and took his breakfast, appellant waiting on him, he (appellant) being the cook; that when deceased came to his breakfast he pointed his pistol at appellant and told him (appellant) he was going to kill him; that subsequently deceased went to his room; that he (appellant) did not kill deceased at the time of pointing the pistol at him (appellant) because he (appellant) wanted to get a "drop on him," therefore, he waited until deceased went to his room and went to sleep; that after the deceased had retired to his room appellant took a shot-gun belonging to Baldwin, another convict guard, and went to deceased's room and opened the door and woke him up, as some of the witnesses state; appellant stated that the deceased had not gone to sleep; that when he (appellant) went to open the door, deceased got his pistol, and he (appellant) killed him. After killing deceased appellant took deceased's pistol, and cut open his grip, took some cartridges from it, got a suit of clothes belonging to Baldwin, dressed himself with these clothes, and went to Port Arthur, sold the pistol and cartridges to a second-hand dealer in Port Arthur, began drinking, took the train that evening, and went to Beaumont, where he was arrested and placed in jail. Appellant's testimony, through himself, was that he took the gun and went to the room and killed deceased. This perhaps is a sufficient statement of the evidence without going into details, much of which was important and directly pertinent to the case.

Appellant was indicted in November. A few days after the indictment was returned, appellant was granted a continuance to take the depositions of parties non-resident to prove a theory of insanity. At the following term of the court this testimony failed him; he then moved to continue on account of the absence of J. P. Kelly, by whom he expected to prove that deceased had threatened his life. This was refused and exception taken. In signing the bill, the court qualifies same as follows: "Of the court's action at a previous term of the court the case was continued by defendant for the want of witnesses by whom he desired to prove insanity on the part of defendant at the time of the commission of the homicide; but before the application was presented at that time, Mr. Sol E. Gordon, one of the attorneys for defendant, told the court that there were three negroes in the county jail by whom he thought he could prove threats by deceased against defendant and abusive conduct and ill-treatment, and that if he could he would go to trial and not ask for a continuance and at the same time stated to the court that such negroes were the only persons by whom he could prove such facts, and the court thereupon had all the negroes brought out of the jail and placed in the court's private office for the purpose of permititng defendant and his counsel to talk fully with said negroes and after such conference with the negroes, said counsel told the court that they could not make such proof by said negroes and would, therefore, have to continue. And at the very time this man Kelly was present, but it was not claimed at that time that he would swear to anything favorable to defendant. So knowing these things, the court overruled the motion." As the motion is presented, under this record, and as qualified by the judge, we do not believe there was any error in refusing the application for continuance. The facts show that Mr. Kelly had not been in the convict camp for some weeks, or at least for sometime prior to the homicide, and knew nothing, if there was anything to know, in regard to any later threats, or the pointing of the pistol at appellant. The intimate relations, friendship, etc., between appellant and deceased would indicate that if deceased had made any threats, which is contradicted by all the witnesses from the convict camp, that there was nothing serious about it; that the overwhelming evidence is that such things did not occur. So viewed from the standpoint of the probability of the proof, we do not think the court erred, but even if Kelly had been present and sworn to the facts stated in the application, they occurred sometime prior to the homicide, and appellant's own testimony, as well as his confessions, eliminate all question of self-defense, for appellant himself states that he waited until deceased went to his room, and then got the gun, went to the room where he (deceased) was and killed him. There could not possibly be from any standpoint, as we understand these facts, the issue of self-defense raised or suggested. We do not, therefore, believe that this testimony could possibly have benefited defendant on the theory of self-defense, if Kelly had been present and testified to such threats,

and as we understand this record the court was not in error in refusing the application.

During the argument an attorney for the prosecution used the following language: "Who is he (pointing at the defendant)? Who vouches for him? He blew in here on the hurricane deck of a tramp steamer flying a foreign flag with a record of two past murders to his credit." Objection was interposed and the court interrupted the counsel and told him not to allude to what defendant had done prior to the homicide in question, and instructed the jury to wholly disregard such argument, and states he would have given a written instruction on the point if the same had been requested, and the court further states that the record will show in several places that the defendant confessed that he had killed several persons before he killed the deceased. To a good deal of such evidence objection was made and sustained, but some went in without objection. As presented, this argument was legitimate, because appellant, among other things, in addition to what the court states, gave a history of his life in regard to being a seaman and traveling, tracing himself to China, Japan, and South America, and back to the United States. There was no error in this.

Another bill recites as follows; an attorney for the State, alluding to the friendship between deceased and defendant: "Defendant killed deceased although deceased intended to use part of his wages to help pay defendant's fine and after so doing deceased and defendant would go to the territory." Exception was reserved to this but State's counsel insisted that the same was within the record. The court ordered him to desist from further remarks along this line, but he still insisted and then said, "I will leave it to the jury." Appellant contends that this was unwarranted by any evidence and wholly without the record and calculated to injure appellant. No charge was requested eliminating this matter. The record will show that the matter was investigated and testified to the jury, but was withdrawn because not sworn to positively and definitely nor was the statement made in presence of defendant, but it was commonly talked among the convicts and those around the camp, that such was the expressed purpose of deceased. As this matter is presented, we do not believe it was of sufficient importance to require a reversal, nor was any instruction asked by appellant to withdraw the remarks from the jury, or in any way controlling it.

The counsel for the prosecution used the following language: "My friend Gordon, alluding to one of the defendant's counsel, spoke of his friend Judas, he could not help but mention the name of his friend Judas; gentlemen, do you know who Judas was? He was the man who betrayed the Savior and caused him to be nailed upon the cross," to which defendant objected because it was unwarranted by the evidence and the name of Judas was not mentioned by counsel alluded to in his argument before the jury, and that it was a personal allusion to defendant's counsel made for the purpose of prejudicing the minds of

the jury against the defendant, etc. The court signs this bill with the following explanation: "The county attorney made the remarks complained of in the foregoing bill, and Mr. Gordon, the attorney therein mentioned, at once excepted and stated to the county attorney that he, Gordon, had not referred to Judas, at all, whereupon the county attorney said: 'Then, Mr, Gordon, I withdraw the statement that you referred to Judas and I apologize to you for so stating; but some one of defendant's attorneys referred to Judas, either Mr. Fleming or Mr. Calhoun, or yourself, but I don't remember which.'" With this statement of the court, which is not contradicted nor sought to be contradicted by bill of exceptions, nor its correctness challenged, we do not see anything of special moment requiring consideration. The fact that Mr. Gordon may not have used the expression, and that Mr. Fleming or Mr. Calhoun did, would not put the State's attorney beyond the right of commenting upon it, and the mere fact that he should have used Gordon's name instead of one of the other attorneys by mistake would not change the fact that one of the attorneys had made the remark imputed to Gordon, and if either made it, the State's counsel would have the right to comment upon it. But if there was any error in it at all, it was of such minor importance that it would not require a reversal of the judgment.

There is another bill of exceptions in the record. The application for continuance states the belief of appellant that Kelly was permitted to escape from the city convict gang where they were working on the streets in order to prevent his being present to testify in behalf of appellant. When the question came up the court certifies that he informed counsel for appellant that he would hear testimony upon that allegation, and if Kelly had been spirited away or permitted to escape so that his testimony could not be used for appellant, that he would grant a continuance. Appellant's counsel declined to investigate the matter, and here the question ended. We do not believe, as presented, there was any error in this, but, as stated in a previous portion of the opinion, Kelly's testimony could not have aided appellant on the question of self-defense, because that issue was not in the case, and that being true, whether Kelly was spirited away or not, in our judgment it would have made no difference; if his testimony could not have aided or assisted appellant on the theory of self-defense, then the absence of Kelly would make no difference, as we understand the testimony of Kelly was only in regard to the fact that deceased pointed a pistol at appellant and threatened to take his life some weeks prior to the homicide; he was not at the camp on the day of the homicide and had not been for sometime, and in fact had been convicted for some offense in the city court, and at the time this case was first called in the district court, was then working out his fine in the City of Beaumont.

There is no exception to the charge, so it is, therefore, not reviewed. The facts, as we view them, show a cold-blooded and deliberate killing, and perhaps with sufficient certainty that the killing occurred for the

purpose of getting the money or property of the deceased; he had the day before his death been paid off as a guard, and appellant knew that he had the money in his possession the night before when they were together in the room with the other convicts. Appellant did take the pistol of the deceased and his cartridges, and sold them in Port Arthur; he took Baldwin's suit of clothes and wore it away and cut open the valise or grip of the deceased from which he took the cartridges, but failed to find the money. The circumstances attending the position of the body of the deceased would indicate that he had been examined or moved after he was shot, and in fact the circumstances of the killing would indicate sufficiently strong for the jury to so believe that the killing was for the purpose of getting deceased's pistol, money, etc., on which to escape, not only from confinement at the camp, but from the country as well.

Finding no error of sufficient importance to require a reversal of the judgment, it is affirmed.

*Affirmed.*